# CHARLESTON.

## SHRIVER *v.* GARRISON.

Submitted September 13, 1887.—Decided November 19, 1887.

1. EVIDENCE—JUDICIAL NOTICE—SETTLEMENT OF FIDUCIARY ACCOUNT.

   Where a court of competent jurisdiction in one of the United States, has by its final order or decree passed upon and confirmed the accounts of an executor, administrator, or other fiduciary, the courts of this State will take judicial notice of the effect of such order or decree in that State in any judicial proceeding in this State affecting the validity of the same. (p. 470.)

2. EXECUTORS AND ADMINISTRATORS—SETTLEMENT—SET-OFF OF INDIVIDUAL DEBT.

   Where a court of competent jurisdiction has confirmed the final account of an administrator, and by its decree directed a certain sum of money to be paid to a guardian as the estate of his ward, such administrator cannot set off against the amount so decreed to such guardian, a debt' due to him from such guardian in his individual capacity. (p. 470.)

3. EQUITY—LAPSE OF TIME—ANALOGY TO LIMITATION OF ACTIONS.

   Where an administrator has invoked the aid of a court of equity to recover from a guardian of a distributee, money alleged to have

been paid by mistake to such guardian, and the evidence adduced in suppport of such payment, shows that it was paid more than five years before the suit was brought, and such guardian relies upon and pleads the statute of limitations, the court will, in analogy to proceedings at law, hold such demand barred by the statute of limitations, unless the plaintiff can bring himself within some of the exceptions of that act.   (p. 475.)

4. Equity.

An administrator suing in a court of equity to recover money alleged to have been paid in ignorance of a material fact, to a distributee in excess of what he was entitled to, cannot avoid the bar of the statute of limitations on the ground that the mistake was not discovered until after the statutory limitation for the commencement of the action had expired, if it appears that he was informed of such other facts as would be sufficient to put him upon such inquiry as would have led to the discovery of such material fact before such cause of action was barred.   (p. 475.)

5. Executors and Administrators—Payment by Mistake—Action to Recover.

If an administrator, with full knowledge of all the facts, voluntarily pays to the guardian of the infant children of his intestate sums of money in excess of the amounts to which they are entitled, under a mistake of law arising out of a misapprehension of the facts, he cannot maintain a suit against such guardian to compel him to refund the amounts so paid to him in excess.   (p. 476.)

6. Executors and Administrators.

Where an administrator voluntarily pays money to a distributee of his intestate, with full knowledge of the facts, but under a mistake of law, he cannot recover it unless the same be necessary for the payment of the debts of the intestate.   (p. 477–8.)

7. Equity—Mistake—Law and Fact.

A case in which it was held that an alleged mistake of a material fact, was a mistake of law arising from an erroneous legal deduction from well-known facts.

Statement of the case by Woods, Judge :

On the seventh of September, 1885, Solomon H. Shriver in his own right and as administrator of John Hagan, Sr., deceased, filed his bill in the Circuit Court of Monongalia county, verified by his affidavit, against James L. Garrison in his own right and as guardian of Patrick, Charles L., Clara May, Kate, Mary, and John Hagans, Jr., the children and heirs at law of said decedent, all of whom were infants

58

at the time of their father's death, seeking to recover from the defendant the sum of $1,538.36, alleged to have been overpaid by the plaintiff, as such administrator, to him in his character as guardian by mistake; large portions of which were so paid and received before the eighth day of November, 1878. The defendant being a non-resident of this State, an order of attachment was issued and levied upon real estate owned in the county of Monongalia by the defendant, who was at first proceeded against by order of publication. The bill alleges that John Hagan, Sr., died on the twenty fourth of December, 1872, in Greene county, Pennsylvania, where he resided at the time of his death, and where the defendant, who is a citizen of that State, resides; that the Orphan's Court of Greene county, having jurisdiction for that purpose, appointed the plaintiff administrator, and the defendant guardian, as aforesaid, and that both were duly qualified, and entered upon the duties of their respective offices or trusts; that soon after the death of John Hagan, Sr., his widow, Matilda Hagan, with his children, removed from Greene county, Pennsylvania, to the town of Dungannon, in Columbia county, in the State of Ohio, where she has ever since continued to reside, and where the child John Hagan, Jr., two or three years afterwards, died, being then an infant of tender years, unmarried and without issue, leaving his mother, brothers, and sisters surviving him; that according to the laws of the State of Pennsylvania his mother was the sole distributee, and according to the laws of the State of Ohio his surviving brothers and sisters, to the exclusion of his mother, were the sole distributees of his personal estate. The bill further states that in the due and regular course of the administration and settlement of the estate of John Hagan, Sr., various sums of money in the hands of the plaintiff as such administrator became subject to distribution, amounting in the aggregate to $40,521.40, as shown by the report of the auditor to said Orphans' Court, and confirmed by it on the tenth of October, 1881, an authenticated copy of the record of which, and of the proceedings of the court thereon, is filed as part of the bill, whereby it appears that said court adjudged that

at the time of his death the domicile of John Hagan, Jr., and of his mother, Matilda Hagan, was in Greene county, Pennsylvania, and that his mother was his sole distributee, and thereupon ordered and decreed that the plaintiff should distribute said $40,521.40 among the said widow and heirs of John Hagan, Sr., as follows:

To Mrs. Matilda Hagan, as widow ..................... $13,507 13⅓
"      "        "          "      as heir of John Hagan, Jr ...... 4,502 37⅔
And to Patrick, Charles L., Clara M., Mary, and Kate Ha-
   gan, each ........................................... 4,502 37⅔

The bill further states that, long before the making of said report, the plaintiff as such administrator, acting under the advice of counsel learned in the law, had paid out and distributed to and among said widow and heirs the sum of $42,059.74⅔, being an excess of $1,538.36 over the said sum of $40,521.40 so found by said auditor's report, and confirmed by the Orphans' Court; and that the whole of the said sum of $1,538.36 was paid by him to the defendant as the guardian of the said surviving infant children, and that the same is still in his hands as such guardian. The bill further states that at the time of the death of John Hagan, Jr., at Dungannon, in Ohio, the plaintiff and defendant both believed, and the latter insisted, that the domicile of Matilda Hagan and of all the said children was in the State of Ohio, and that the personal estate of John Hagan, Jr., was distributable to and among his surviving brothers and sisters according to the statute of distributions in force in the State of Ohio at the time of his death; and that, in this belief, the plaintiff continued to make payments to the defendant as guardian of such surviving children, intending to pay him the entire sums to which they were entitled as distributees of their father, and of their deceased brother, and so he continued to make payments to the defendant as such guardian until they aggregated the sum of $24,050.23, whereas the whole amount to which as such guardian he was entitled was only $22,511.87; and that for the excess of $1,538.36, with interest from the eighth of November, 1878, he asks a decree against the defendant. The bill further charges that the defendant, in accounting with his wards, has reserved and set apart one sixth part thereof as the share of John

Hagan, Jr., for the following reason: Long after all of said payments had been so made to the defendant as such guardian, the widow, Matilda Hagan, in a proceeding in said Orphans' Court, obtained said adjudication; that at the time of his death, John Hagan, Jr., had his domicile in Pennsylvania; that after this adjudication he paid to the widow the amount directed to be paid to her, although he had, as before stated, paid to the defendant $1,538.36, part of the same fund, in the mistaken belief that John Hagan, Jr., at the time of his death had his domicile in Ohio; and prays that the defendant repay him said $1,538.36, with interest, and for general relief. At October term, 1885, the defendant appeared and demurred to the bill, which demurrer, at February term, 1886 was overruled, with leave to the defendant to answer within one day; and failing to do so, the cause was referred to Commissioner Fast, to ascertain and report to the court at its next term: *First.* Who were the distributees of John Hagan, Sr., deceased, entitled to his personal estate ? *Second.* Who were the distributees of John Hagan, Jr., deceased, entitled to the personal estate of him, the said John Hagan, Jr. ? *Third.* Whether the complainant, as administrator of said John Hagan, Sr., has paid over to the distributees of his intestate the moneys coming into his hands as such administrator to which such distributees were entitled, how much he paid to each distributee, or to the guardian of each, and the name of each distributee to whom or to whose guardian he made any such payments, with the date of such payments. *Fourth.* How much money, if any, the said administrator paid to the defendant as guardian of the infant children of said John Hagan, Sr., in excess of the sum or sums which said guardian was entitled to receive, and under what circumstances such excess, if any, was paid, and at what time, and what disposition was made by said defendant of any such excess, if any such was paid to him ? *Fifth.* State the amount of any such excess, with interest included, from the time or times of its payment to said defendant. *Sixth.* Any other matter deemed pertinent by the commissioner, or especially required by either of the parties. And leave was given the defendant to file his answer before the commissioner, and to the plaintiff to reply

thereto, in accordance with which the defendant filed his answer, to which the plaintiff replied generally.

The answer admits the appointment and qualification of the plaintiff as administrator, and of respondent as guardian as aforesaid, by the Orphans' Court of Greene county, Pennsylvania, and that it had jurisdiction in the premises over them in the discharge of their duties as such administrator and guardian. It also admits that the plaintiff, as such administrator, made sundry settlements of his accounts before said court, and distributed and paid out sundry sums of money, under and by virtue of such settlements, and in pursuance of the order and direction of said court; but denies that upon any of such settlements it was found that the plaintiff, as such administrator or otherwise, had overpaid, or paid in excess, any sum of money to respondent in his own right or as such guardian. On the contrary, the respondent avers that long after the alleged overpayment was made, and long after the settlement of 1881 referred to in the plaintiff's bill, his accounts as such administrator were audited, surcharged, falsified, and restated by said Orphans' Court, and confirmed, as upon a final settlement of the same, on the seventeenth of March, 1885, as appears by an authenticated copy thereof, and the proceedings had thereon, from the records of said court, filed as part of the answer, whereby it appears that there was then due from the plaintiff as such administrator to respondent as such guardian, in addition to the sum found due on the settlement of 1881, the sum of $307.84 8-9 for and on account of each of his said wards, amounting in the aggregate to $1,539.24 4-9, a sum more than sufficient to satisfy said alleged overpayment, if the same had in fact been made. These last named amounts have not been paid to respondent, nor in any way received by him, unless by way of said alleged overpayment, which pretended overpayment respondent here denies. He admits that John Hagan, Sr., left surviving him his widow, Matilda, and the six infant children named in the bill as his heirs and distributees; that the child, John Hagan, Jr., died in infancy, intestate, unmarried, and without issue, and that it was adjudged by said Orphans' Court, in 1881, in a "partial account" and distribution of the personal estate of John

Hagan, Sr., that the mother of John Hagans, Jr., took his share of said personal estate, and decreed that the plaintiff, as such administrator, should distribute the estate upon that basis. The answer admits that respondent received from the plaintiff at sundry times sundry sums of money, for which he received to him as such guardian of the surviving infant heirs of John Hagan, Sr., and avers that he has settled for and accounted for all moneys received by him with said Patrick and Charles L. Hagan, who have come of age. He further avers that if any overpayments were made to him as guardian by the plaintiff as administrator, they were made to him voluntarily under the advice of plaintiff's counsel, under an alleged mistake of the law, and were received by respondent in the utmost good faith, in his fiduciary character, and fully accounted for by him upon final settlement with two of his wards, who have arrived at full age, who now, and for a long time past, have resided in Ohio.

Respondent avers that all of the payments made to him by the plaintiff were promptly charged to himself as guardian, and that all, or nearly all, of them were so made to him prior to 1878; and a suit to recover the same would be barred by lapse of time, and he pleads and relies upon the statute of limitations as a bar to the plaintiff's claim. Respondent in his answer specially avers that the plaintiff is not entitled to a credit of $2,440.30 claimed by the plaintiff, as the same was in effect real estate belonging to his wards, and not personal estate belonging to his intestate; and insists that it will be impossible in this suit to adjust the differences between the plaintiff and defendant for want of proper parties, involving, as it does, the payments made to said Matilda Hagan, and to the now adult children, alleged to have been made to them by the plaintiff, and also the condition of the accounts and payments made by respondent to his late wards after they became of age, upon the basis of said alleged overpayments, into which payments and settlements respondent was led by the negligence and mistakes of the plaintiff, and because any just and complete settlement of all the accounts of the plaintiff as administrator, and of respondent as guardian, can be legally and prop-

erly made only by the said Orphans' Court, under whose orders and decrees their settlements and disbursements were made, and where any mistakes or errors could be corrected, if any existed. On the twenty seventh of January, 1887, the commissioner returned the report, whereby he found—*First.* That Matilda Hagan, the widow, and her children, Patrick, Charles L., Clara M., Kate, Mary, and John Hagan, Jr., were the distributees of John Hagan, Sr. *Second.* That Matilda Hagan was the sole distributee of John Hagan, Jr., and that the plaintiff as such administrator had, in the manner ordered and decreed by said Orphans' Court, paid out and distributed to the several parties entitled thereto the sum of $40,521.40, which by said "partial account" had been ascertained by the decree of said court to be due, and was ordered to be paid to them respectively, on the tenth of October, 1881. *Third.* The commissioner further reported that in the final settlement of his administration accounts, which was confirmed by said Orphans' Court, it appears that in addition to the funds which he has charged in his "partial settlement," and had disbursed under the order of said court, there remained in his hands on the seventeenth day of March, 1885, on account of other moneys received by him after said "partial settlement," subject to distribution, a net balance of $2,770.64, which the said Orphans' Court, on the seventeenth of March, 1885, ordered and decreed to be distributed as follows:

| | |
|---|---|
| To Matilda Hagan, as widow....... ............ ..... | $923.54 1-3 |
| To Matilda Hagan, as heir of John Hagan, Jr.,......... | 307.84 8-9 |
| To Patrick Hagan. ........ ......................... | 307.84 8-9 |
| To guardian of Charles L. Hagan..................... | 307.84 8-9 |
| To guardian of Clara M. Hagan ..................... | 307.84 8-9 |
| To guardian of Mary Hagan......... ............... . | 307.84 8-9 |
| To guardian of Kate Hagan.......................... | 307.84 8-9 |

—And that of these sums the amounts to which Patrick and Charles L. were entitled had been paid to them, respectively, by said administrator, as both of them had become of full age; but that the several amounts decreed to the guardian of Clara M., Mary, and Kate Hagan, with interest thereon from the seventeenth March, 1885, to the date of his report, which was the fifteenth January, 1887, amounting to the sum of $1,024.82, had never been paid. *Fourth.* He further reported

that, according to the finding of the auditor's report embraced in said partial settlement, the net amount in the hands of the administrator for distribution was $40,521.40, and that the said Orphans' Court, having decided that Matilda Hagan was the sole distributee of John Hagans, Jr., decreed that the plaintiff, as such administrator, should pay to Patrick Hagan the sum of $4,502.37⅔, and to the guardian, for Charles L., Clara M., Mary and Kate Hagan, the like sum of $4,502.37⅔ for each of said wards; but that it appeared to the commissioner, from the receipts filed before him, signed by the defendant, that the administrator had paid to him as such guardian $24,050.27, being an excess of $1,538.30 over $22,511.88, which he ought to have received as guardian under said partial settlement; which excess of $1,538.30 the commissioner ascertained and reported was composed of the following items: $1,230.01, being part of receipt No. 32, dated the eighth day of November, 1878, for $3,766.12, remaining after applying the residue to the several amounts theretofore paid to the guardian to make up the sum total of $22,511.88; also the further sum of $193.33, paid August 8, 1880; $28.00 Aug. 18, 1880; also $28.55, paid November 13, 1878, and $15.82 and $42.68, dated May 27, 1884; and that these several sums, with interest from their respective dates to the date of his report, amounted to the sum of $2,270.78, from which he deducted the amount of $1,024.82, due to the guardian on said final settlement, leaving the defendant indebted to the plaintiff $1,245.96, with interest from the fifteenth January, 1887; and the commissioner accordingly so reported. *Fifth.* He further reported, that these payments in excess were made under these circumstances: "The senior John Hagan departed this life on the twenty fourth of December, 1872, domiciled in Greene county, Pa., and in the month of March following the younger John Hagan was born. In the month of August, 1873, the widow, Matilda Hagan, with all her said children, removed from the said county of Greene in the State of Pennsylvania to the town of Dungannon, in Columbiana county, in the State of Ohio, where she has ever since continued to reside. Here, in March, 1875, the said John Hagan, Jr., died. The administrator, as well as the guardian, acted in the

belief that John, Jr., died domiciled in the State of Ohio, where, by the laws of that State at the time of his decease, his brothers and sisters would take his personal estate as distributees, to the exclusion of the mother. The administrator therefore made payments to the guardian of the surviving wards, on the theory that the brothers and sisters of said John, Jr., were his distributees, in excess of the amount which he ought to have paid; which excess, with its interest and the times at which said sums in excess were paid, is hereinafter set forth. The said defendant and guardian has made no distribution of any such excess which came into his hands."

To this report the defendant excepted as follows : "*First.* For the reason that he charges the defendant, and credits the plaintiff, with the whole amount of $2,440.34, (voucher 13.) *Second.* Because he charges against the defendant, as excess or overpayments made by plaintiff, the following sums at following dates, with interest from said dates, viz.: November 8, 1878, $1,230.01; August 8, 1880, $193.33; August 18, 1880, $28.00, and November 13, 1878, $28.55—all of which are barred by the statute of limitations pleaded by defendant; and with $15.82, May 27, 1884, and $42.68, same date, not claimed in the bill, and not sustained by the evidence. *Third.* Because said report charges defendant with interest on any alleged or pretended balance for any time prior to the date of plaintiff's final settlement, March 17, 1885."

The cause was finally heard on the seventeenth day of February, 1887, upon the bill, answer of defendant, general refutation thereto, report of said commissioner, and the defendant's exceptions thereto, and argument of counsel. On consideration whereof the court overruled the defendant's exceptions to the commissioner's report, and confirmed the same, and thereupon adjudged, ordered, and decreed that the defendant pay to the plaintiff the sum of $1,245.96, with interest from fifteenth January, 1887, until paid, and the costs, and that in default of payment for 60 days, then a special commissioner appointed for the purpose was authorized and directed to sell the interest of the defendant in the real estate mentioned in the sheriff's return to the order of

attachment issued in this cause, at the place and on the terms mentioned in the decree.    From this decree the defendant has obtained an appeal and *supersedeas;* and for assignment of errors he says the court erred—*First,* in overruling his demurrer to the plaintiff's bill; *second,* in overruling his exceptions to the commissioner's report; *third,* in disregarding his plea of the statute of limitations; *fourth,* in charging him with interest on the alleged overpayments from a date earlier than the seventeenth of March, 1885; *fifth,* and for other errors appearing on the face of the record.

*Berkshire & Sturgiss* for appellant.

*Jas. Morrow, Jr.,* for appellee.

Woods, Judge :

The plaintiff rests his right to recover from the defendant the sum of $1,538.36, alleged to have been overpaid by him as administrator to the defendant as guardian of his surviving wards, on the ground that all the payments so made by him were paid under the mistake that John Hagan, Jr., at the time of his death, in March, 1875, had his domicile in the State of Ohio, and that the surviving wards were his sole distributees.    The defendant resists the plaintiff's demand, on the ground that no such overpayment was ever in fact made to him, either in his fiduciary or individual character; that, if any such payments in excess were so made, they were paid voluntarily, and without solicitation on the part of the defendant and were received by him as guardian in perfect good faith, without any knowledge of any such mistake; that, if any such mistake was in fact made by the plaintiff, it was a mistake of law, based upon facts to him personally well known to the plaintiff at the time of the death of John Hagan, Jr.; that all such pretended overpayments were barred by the statute of limitations and that all matters in controversy arising out of their fiduciary relations, could only be, and they have in fact been finally settled and adjusted by the proceedings in the Orphans' Court of Greene county, Pennsylvania, which had ju-

risdiction over the parties as well as the subject in controversy.

It is well-settled law in Pennsylvania that the Orphans' Court is a court of record, with all the qualities and incidents of such courts at common law, and that in all matters within its jurisdiction its proceedings and decrees can not be reversed or avoided collaterally in any other court; but they are liable to be reversed, modified, or altered on appeal to the Supreme Court within three years, and, in a proper case, by a bill of review within five years after the final settlement of the account. *Weiting* v. *Nissley*, 6 Pa. St. 141; 1 Purd. Dig., § 203, p. 447; *Zinn's Appeal*, 10 Pa. St. 469. The Orphans' Court of each county in Pennsylvania has the care of the persons of minors resident within such county, and of their estates, and has power to admit such minors when and as often as there shall be occasion to make choice of guardians and to appoint guardians for such as they shall judge too young, or otherwise incompetent to make a choice for themselves. By the laws of Pennsylvania it is made the duty of executors and administrators to make a true and perfect inventory of all the goods, chattels, and credits of the deceased, as far as they may know or ascertain them, and exhibit the same into the register's office within 30 days from the time of administration granted; and also a just account and settlement thereof in one year, or when thereunto required. Purd. Dig., p. 414, §49. Before any register shall allow the accounts of any such executor or administrator, he is required carefully to examine the same, and require the production of the necessary vouchers, or satisfactory evidence of the items contained in it; and when he shall have allowed and filed any such account, he is required to transmit it to the Orphans' Court at its next session, being not less than 30 days distant from the filing thereof, and give at least four weeks' notice before the time appointed for the presentation of such accounts for confirmation by the Orphans' Court; and no such account can be confirmed and allowed by such court (save in certain excepted cases) unless such notice has been given. All accounts of executors, administrators, guardians, and trustees so presented to the Orphans' Court shall be examined by the court, and if not

excepted to, shall, after due consideration, be confirmed. Purd. Dig., pp. 414, 415, §§ 189–195. By sections 41, 42, p. 413, Purd. Dig., it is made the duty of any guardian, within 30 days after any property of his ward shall have come into his hands or possession, or into the hands or possession of any person for him, to file in the office of the clerk of the court a just and true inventory and statement, on oath or affirmation of all such property; and whether required by the court to give security or not, at least once in three years, and at any other time when required by the court, to render an account of the management of the minor's property under his care, which account shall be filed in the office of the clerk of the Orphans' Court, for the information of the court and the inspection of all parties concerned.

These provisions in regard to such accounts have been construed by the Supreme Court of Pennsylvania. In *Rhodes's Appeal*, 39 Pa. St. 186, Joseph Rhodes died in 1846, having devised his whole estate to his widow, Rebecca, for life, with remainder to his brothers and sisters. In 1847 his executors filed an account, showing a balance in their favor of $1,538.71, to which no exceptions were filed, and it was absolutely confirmed by the Orphans' Court in May, 1847. The widow died in 1857, and in 1859 the surviving executor filed a second and final account, which was referred to an auditor for settlement and distribution. The balance of $1,538.71 in the former account was carried as a credit into the final account. To this the remainder-men objected, and asked to show errors in the first account, but the auditor refused to permit them to do so, and the Orphans' Court sustained the auditor's report. Upon appeal the Supreme Court held that there was no difference between an original and final account of executors and administrators; the terms "final decree" are applicable to both, and they are to be examined and confirmed as they are filed, without distinction; and that where an account of an executor had been filed in the Orphans' Court, and confirmed by the court, and no appeal taken within three years, or bill of review filed within five years, after the date of such confirmation, the decree is conclusive, and the account can not be re-examined on the coming in of a subsequent account; and that a decree of the Orphans'

court, confirming any account of an executor, whether final or otherwise, is a definitive decree from which an appeal will lie to the Supreme Court.

In *Shindel's Appeal*, 57, Pa. St. 43, Henry Masser died in 1853. On the twenty ninth of November, 1856, his executor filed a " partial account," showing a balance of $1,923.96 due the estate, which, on the eighth of April, 1857, was confirmed absolutely. On the twenty-third of March, 1861, he filed a second " partial account," showing a balance of $600.09 due the estate, which was in like manner confirmed, but the balance in the first account was not carried into the second. On the eighth of December, 1865, he made a final account, showing a balance of $3,483.51 due the estate, but neither of the former balances was carried into the last account, nor was any reference made to them. Upon exceptions being filed, these reports were referred to an auditor, who found that the executor had received two sums of money which he had not accounted for, amounting to $578.92, including interest, and he charged him with that amount. Upon exceptions to this report, the Orphans' Court rejected the said item of $578.92, but upon appeal the Supreme Court sustained the auditor's report, and reversed the ruling of the Orphans' Court; and Thompson, C. J., delivering the opinion of the court, says that "*Rhodes's Appeal*, 39 Pa. St., [*supra*,] decided no more than that what are known as 'partial accounts' of executors and administrators, when confirmed absolutely, are final in regard to all they contain. The settlement of a 'partial account' presupposes a final account to be presented at some time or other, and it also presupposes that everything not in previous accounts is in that, and if not, that parties interested may except to the account for that reason, and show, if they can, that it ought to be in it. "

In *Leslie's Appeal*, 63 Pa. St. 355, the court held that the term " partial accounts " in the Orphans' Court implies, *ipso facto*, that nothing is settled by it but those matters constituting the items or questions in the statement itself; and that when executors charged themselves in a " partial account " with the inventory of debts due to the decedent, this did not preclude credits in the final accounts for partial payments made to the decedent, or for those debts which proved

desperate. It has been held then that if an administrator undertakes distribution without the direction of the Orphans' Court, he does so at his own risk; for, as said by Strong, J., "he can make no distribution which the Orphans' Court would not have made." *Moorhead's Appeal*, 32 Pa. St. 297. But a decree of distribution is conclusive upon all questions until reversed. *Bradshaw's Appeal*, 3 Leg. & Ins. Rep. 27.

From these authorities and from the authenticated copy of the record of the proceedings of the Orphans' Court of Greene county, Pennsylvania, had upon the "final account" of the plaintiff, in evidence in this cause, as well as from the fifth finding of fact in the report of the commissioner, Fast, it is apparent that on the seventeenth of March, 1885, when such "final account" was confirmed by said Orphans' Court, he was, by its judgment, found indebted to the estate of his decedent in the sum of $2,770.64, and that said court then ordered and decreed that he should distribute the same, as hereinbefore stated, whereby there was ordered to be paid to each of his wards, Charles L., Clara M., Mary and Kate Hagan, the sum of $307.84 8-9, of which, the amounts decreed to his wards, Clara M., Mary and Kate Hagan remained unpaid, and with the interest accrued thereon up to the fifteenth of January, 1887, amounted to the sum of $1,024.82. This decree of the Orphans' Court, so far as the record shows, has never been reversed, but remains in full force; and we have seen that under the laws of Pennsylvania it is final and conclusive, and cannot be reversed or avoided collaterally in any other court, except upon an appeal within three years, or, in a proper case, by a bill of review within five years after such final settlement of the account. And where a court of competent jurisdiction in one of the United States has, by its final order or decree, passed upon and confirmed the accounts of an executor, administrator, or other fiduciary, the courts of this State will take judicial notice of the effect of such order or decree in that State in any judicial proceedings in this State affecting the validity of the same. Against this decree in favor of his wards the plaintiff can not set off a debt due to him from the defendant in his individual capacity, however just, or in whatsoever manner it may have

been incurred.   Such a proceeding, if allowed in this case, would not only deprive these wards of their property, in a suit to which they are not parties, but it would effectually "avoid collaterally" the force and effect of the decree of said Orphans' Court, which, according to the law of Pennsylvania, is conclusive of the rights of the parties interested therein.   This error of the commissioner becomes still more apparent when he reports in the same immediate connection that the plaintiff paid to the ward, Charles L. Hagan, who, since the decree, had become of full age, the sum of $307.84, decreed to him, without any abatement therefrom on account of said alleged overpayment, when he had the same right to do so that he had to apply such alleged overpayment to the total extinguishment of the amounts decreed each of his wards, Clara M., Mary and Kate Hagan. The Circuit Court manifestly erred in confirming in this respect the report of the commissioner.

But has the plaintiff shown that he overpaid the defendant as guardian the sum of $1,538.36, or any other amount; and if so, when and under what circumstances was it so paid; and has he, under such circumstances, the right to recover the same from the defendant in his capacity as guardian or as an individual?   It is admitted by the plaintiff in his bill, proved by his own deposition, and found by the report of the commissioner filed in the cause, that all the payments made by him as such administrator, to the defendant, were so made to him in his capacity as such guardian, and that in that capacity he accepted and received the same; that the several amounts of such payments, as well as the times when paid, appeared in 35 separate receipts filed with his deposition, now in the record, and numbered from "1" to "35," both inclusive, amounting in the aggregate to $24,049.96; and that they were all so paid under the advice of counsel learned in the law in Ohio and in Pennsylvania, long before the making of said auditor's report, which was confirmed on the tenth of October, 1881; and that they were so paid to and received by the defendant, as such guardian, under the mistaken belief that John Hagan, Jr., at the time of his death, had his domicile in Ohio, and that his brothers and sisters were his

sole distributees; and that the alleged excess so overpaid has never been distributed by the defendant to his wards.

It further appears from the report of the commissioner, and the deposition of the plaintiff, that there was some doubt in the minds of the plaintiff's counsel, Wyly, Buchannon and Walton, as to who would be the heirs or distributees of John Hagan, Jr.; and that, being so advised, he went to Ohio where the child died, to ascertain how the law there would distribute the money; and that he was advised by his counsel there that the brothers and sisters of John Hagan, Jr., would be entitled to his estate; that he returned and told Wyly, who then advised him to pay the share of John Hagan, Jr., to the guardian of his brothers and sisters; that up to the eighth of September, 1881, he supposed the domicile of John Hagan, Jr., at the time of his death, was in the State of Ohio; that he was frequently at their house in Ohio, where the widow and mother of John Hagan, Jr., had built a fine house, and his understanding was that they intended to make that place their home; that they so expressed themselves, and he believed them, and they still lived in Ohio; and the payments so made to the defendant were made to and received by him under the foregoing mistake. The plaintiff proved by his own deposition that when his deposition was taken he had in his possession a book in which he kept a list of each of said 35 receipts, corresponding in all respects with the receipts. It further appears from the record of the proceedings of the Orphans' Court filed with his bill as Exhibit A, that the plaintiff's partial account," which was confirmed on the tenth of October, 1881, was filed in said court on the sixth of April, 1881. From an inspection of these 35 "receipts" it appears the payments specified in receipts 1, 2, 3, 4, 5, 6, 7, 8 and 17, amounting in the aggregate to $5,976.25, were all made during the lifetime of John Hagan, Jr., and that 15 of them, all of which but one bore date after his death, amounting in the aggregate to $16,572.20, appear to be transfers in kind of assets belonging to the estate of the plaintiff's decedent. While the other receipts appear to have been given for cash, yet it is proved by the deposition of the witness Bradley, who had personal knowledge of nearly all these transactions, that many of the items

mentioned in the receipts as " cash " were in fact obligations, and not cash, and that the actual cash paid was but a small amount; and this evidence is in no respect contradicted or denied.

From receipt " 13," for $2,440.34, dated July 8, 1875, it appears that at the time of the death of John Hagan, Sr., he and one P. M. McCollough, who was the surviving partner of the firm of P. McCollough & Co., which had been composed of said John Hagan, Sr., and P. McCollough, were joint owners of valuable real estate, which, in 1875, was partitioned between him and the heirs of Hagan, Sr., and that in this partition, one of these parcels was charged with the sum of $2,440.34, as owelty and that this portion was accepted by the defendant as guardian for his wards, and they thereby became liable to pay that sum to said McCollough, who was largely indebted to John Hagan, Sr., at the time of his death, and that this sum of $2,440.34 was applied by the plaintiff as such administrator as a credit upon such indebtedness, and he thereupon claimed and received from the defendant as guardian receipt 13 for that amount. What was the amount of the indebtedness of McCollough to the intestate does not appear; but that it was very large may be safely inferred from an inspection of receipts No. 12, for $3,365.60, also dated July 8, 1875; and No. 7, for $500, dated August 31, 1874; and No. 8, for $600, dated November 18, 1874; and No. 14, for $1,481.13, and No. 32, for $3,766.12, dated November 8, 1878, amounting in the aggregate to $9,712.85, all of which, upon their faces, show that they were given for cash or claims collected, and paid over by McCollough. If the plaintiff as such administrator charged himself with the whole amount due to his intestate from McCollough, including the said $2,440.34, for which he obtained credit in making owelty of partition, then, in his settlement with the guardian, he would be entitled to the credit of $2,440.34 mentioned in receipt 32; but if he charged himself with only the residue of McCollough's debt, then would he appear to have overpaid the defendant the amount specified in receipt "No. 32."

The " partial account " actually filed by the plaintiff on the sixth of April, 1881, does not appear, and it is impossible to tell what items it embraced; all the information

which the plaintiff has been pleased to give the court in regard to it is that on the sixth of April, 1881, he had in his hands $4,053.40 belonging to the estate of his decedent, which he was ready to distribute, and which the Orphans' Court ordered him to distribute, in the manner already stated. He had the evidence within his power—most probably in his book, where he listed all the receipts taken by him—to make this matter perfectly plain, but for reasons sufficient for himself he prefers to rest his case upon the presumption that he charged himself with all the assets belonging to the estate of his intestate, overlooking in the mean time that it is the duty of the administrator to know what amount of assets are in his hands for distribution, and to pay out the same to those entitled to receive it; and, while the law presumes that he will do so, it will not presume that any part of the money so distributed as assets of the intestate are the individual funds of the administrator. It is in the highest degree improbable, nay, it seems absolutely incredible, that this plaintiff, in the administration of an estate of at least $50,000, with receipts for every dollar disbursed by him to this guardian in his possession, carefully listed in his book to guard against accidental loss, should continue to pay out, in kind, the assets of the estate, until he had overpaid, by mistake, to the defendant as guardian, $1,538.36, three years before filing his partial account; and that, discovering his mistake on the eighth of September, 1881, more than a month before its confirmation, he should never mention such mistake, or take any step to correct it; and that, in addition to this negligence, he should three years afterwards file a "final account," which was not confirmed until the seventeenth of March, 1885, showing that he had in his hands for distribution the further sum of $2,770.64, which was in like manner ordered to be distributed, and that this pretended overpayment should again be so entirely forgotten or overlooked that he should make no effort to correct the mistake or reclaim the money. It is true that the decree of the Orphans' Court confirming the "partial account" is final and irreversible, and that it is conclusive upon all parties as to the items contained in it, but the court cannot presume that it contained everything that might have been or

should have been included in it, or that any particular item was so included; and therefore no presumption arises from said "partial account" that any such overpayment had been made. This plaintiff was in duty bound to know, and doubtless he did know, the amount of the estate in his hands for distribution ; and he was bound to know who was entitled to share in its distribution. From a careful consideration of all the circumstances in this case we are of opinion that the plaintiff has failed to show that he has overpaid to the defendant the sum of $1,538.36, or any other sum whatever. But if it even be admitted that such overpayment was in fact made, it appears from the face of the receipts themselves that $1,479.89 of this sum was paid as early as August 18, 1880 ; but as this suit was not commenced until September 7, 1885, this Court, following by analogy the proceedings of courts of law, will in this case allow the statutes of limitations to bar the plaintiff's recovery therefor, as he has failed to bring himself within any of the well-recognized exceptions to the statute. Nor can the in th case in judgment avoid the bar of the statute on the ground that this mistake was not discovered until the limitation of five years had expired before this suit was brought; for he had knowledge of this alleged overpayment from the time it was made,—he had the evidence of it in his own possession, and it was his duty to know it. It appears from his own testimony, given before the auditor in support of the pretensions of the widow, that her domicile and that of her son, John Hagan, Jr., was in Pennsylvania, that "he understood from her about the time she moved to Ohio, and afterwards, that she intended to return to Greene county after schooling her children ; that she told him that she went to Ohio for that purpose. In the partition of the real estate of John Hagan, Sr., he knew she wanted the house and lot in Jollytown in her own right, as a place to live, but she did not get it ; and that he urged her to build the house in Dungannon, because he thought the house in which she lived was unhealthy." And as we have already seen he went to Ohio to ascertain how distribution was to be made ; and acted in regard to all these matters under the advice of counsel. The plaintiff had knowledge

of facts sufficient to discover this mistake long before he filed his "partial account," if he had faithfully discharged his duty by filing such account within one year from his qualification, as the Pennsylvania statute required him to do, instead of waiting as he did for more than eight years after his qualification. Section 49, Purd. Dig., p. 414. If therefore the plaintiff failed to discover his mistake until after he filed his "partial account," it was because of his own gross negligence ; and he can not rely upon this negligence to avoid the bar of the statute of limitations.

But was this plaintiff entitled to recover from this defendant the amount of this overpayment if the same had been in fact made, even if the demand had not been barred by the statute of limitations? In *Davis* v. *Newman*, 2 Rob. (Va.) 664, where a testator owing no debts had bequeathed legacies, and his executors voluntarily made considerable payments to the legatees, under the belief that a bond for a large amount due to the testator was good and would be collected, but the bond turned out to be worthless, and the other assets were less than what was paid the legatees, it was held that he could not recover back from the legatees any part of what he had paid them. In this case the payments were voluntary, but it was alleged that they were made under a mistake of fact as to the value of the assets, for when the money was paid to the legatees, all parties supposed the bond was good and would be collected, and the executor in settling with the legatees acted under that impression; and, there being no creditors, the executor sued to recover for his own benefit the amounts so overpaid to the legatees. This relief was denied, and Allen, J., delivering the opinion of the court, said : "It is the duty of the executor to make himself acquainted with the condition of the estate. The means are in his hands, and if he neglects to avail himself of them it is his own fault. If he voluntarily pay the legatee, the latter has a right to consider the money as his own, subject to be called upon to refund if necessary for the payment of debts. The hardship of the case is greater upon the legatee than upon the executor. He has been in no default ; no duty was imposed upon him to examine into the state and condition of the assets. He receives

such a payment under the conviction that he will never be called upon to refund it. It would be the grossest injustice, under such circumstances, to permit the executor, who had thus misled him by his negligence or inattention to his duties, to compel him at some distant day to refund the money." This same question was under consideration by Court in *Anderson* v. *Piercy*, 20 W. Va. 282, where the same principle was announced. Green, J., delivering the opinion of the Court, said : "It may be regarded as settled law in this State and in Virginia, as well as in England, that when an executor voluntarily pays a legacy, he can not afterwards maintain a bill to compel a legatee to refund, unless it becomes necessary for the discharge of debts."

It is contended by the counsel for the appellee that the alleged mistake of the plaintiff was a mistake of a material fact, and that where that is the case equity has jurisdiction to afford relief. But from what is disclosed in this record, the mistake was not a mistake in regard to a material fact, but it was a mistake of law resulting in an erroneous legal deduction from existing facts, personally well known to the plaintiff from the time the widow removed to Ohio, in August, 1873, including among them the essential fact that at the time she so removed she only intended to remove there temporarily, and after a specified time to return to her property in Green county Pennsylvania. He therefore knew every material fact, a knowledge of which was necessary to form a correct conclusion as to the domicile of John Hagan, Jr., at the time of his death; and no statement made by his mother after his death as to her intentions in the future could work a change in his domicile; and if the plaintiff suffered himself to be misled by such subsequent statements, that was the result of his own negligence. The mistake, therefore, if any existed, was one of law, with full knowledge of all the facts, and cannot, unless accompanied by imposition, misrepresentation, undue influence, misplaced confidence, or surprise, furnish grounds for the interposition of a court of equity.

In *Bank* v. *Daniels*, 12 Pet. 32, it was held that a mistake of law, stripped of all other circumstances, was not relievable in a court of equity, and that whatever exceptions there

may be to this rule will be found few in number, and to have something peculiar in their character, and to involve other elements of decision. In *Beard* v. *Beard*, 25 W. Va. 486, this Court held that money paid voluntarily, with full knowledge of the facts under a mistake of law, cannot be recovered; and that where a defendant, after suit brought, and a decree of reference not settling his liability, with full knowledge of all the facts, voluntarily pays a part of the demand against him, and a decree is afterwards rendered against him for the residue of the demand, which upon appeal is reversed, he cannot recover the part so paid under his own mistake of law, made voluntarily with full knowledge of the facts. And Johnson, P., delivering the opinion of the Court in that case, said : " It is now too well settled in Virginia and this State to be controverted that where one voluntarily pays money to another, with full knowledge of the facts, but under a mistake of law, he cannot recover it." The same principle is also announced in *Haigh* v. *Loan Ass'n*, 19 W. Va. 792. See, also, *Harner* v. *Price*, 17 W. Va. 523; 1 Story Eq. Jur., § 138; *Brown* v. *Armistead*, 6 Rand. (Va.) 594; *Zollman* v. *Moore*, 21 Grat. 313. " Nor is it in every case where even a material fact is mistaken or unknown, without any default of the parties, that a court of equity will interpose. The fact may be unknown to both parties, or it may be known to one and unknown to the other. If known to one party and unknown to the other, that, in some case, will afford a solid ground for relief; as, for instance, where it operates as a surprise or fraud upon the ignorant party. But in all such cases it is not the mistake or ignorance of material facts alone that is the ground of relief, but the unconscientious advantage taken of the party; for if the parties act fairly, and it is not a case where one is bound to communicate the facts to the other upon the general ground of confidence, a court of equity will not interfere. "

In all cases where the means of information are alike open to both parties, and where each is presumed to exercise his own skill, diligence and judgment with regard to all the extrinsic circumstances,—in all cases where the parties act upon their own judgment in regard to matters equally open

to both of them, or where the fact is equally unknown to both parties, or where each has equal and adequate means of information, or where the fact from its own nature is doubtful,—in every such case, where the parties have acted in entire good faith, a court of equity will not interpose between them; for in such cases the equity between the parties is equal, and when it is so a court of equity is generally passive, and rarely exerts an active jurisdiction. Where each party is equally innocent, and there is no concealment of facts which the other has a right to know, and no surprise or imposition exists, the mistake or ignorance, whether mutual or unilateral, is treated as laying no foundation for equitable interference. It is strictly "*damnum absque injuria.*" 1 Story Eq. Jur., §§ 148, 151.

For these reasons the decree complained of must be reversed, with costs, and the bill dismissed with costs, in the Circuit Court.

REVERSED.