ANNIE BOOTHE CARROLL et al. *v.* HARRY R. BOWLING et al.

*Executors—Payment of Fund to Life Tenant—Resulting Loss—*
*Secondary Liability of Executor—Reimbursement From*
*Life Tenant's Estate—Substitution and Subroga-*
*tion—Voluntary Payment—Limitations.*

That a fund was paid by executors, without restriction, to one to whom the will gave merely a life interest therein, and who turned out to be incapable of handling it, did not of itself show such negligence as to constitute waste by the executors, making them primarily liable for the resulting loss of the fund, so as to preclude them, upon being required to make good the loss to the remaindermen, from seeking reimbursement from the life tenant's estate. 　　　　　　　　　　　　　　pp. 63, 64

Nor were the executors guilty of waste because one of them, though knowing of a proposed improper investment by the life tenant, which resulted in loss, failed to prevent it, owing to his erroneous assumption that the life tenant was entitled to handle the assets as she pleased. 　　　　　　　　　　　　p. 64

While the wrongful distribution of a fund by executors to one who is merely life tenant thereof, without safeguarding the interests of the remaindermen, resulting in a loss to the latter by reason of improper investments by the life tenant, constitutes a *devastavit* for which the executors are responsible, their responsibility is secondary only, while the life tenant is primarily liable. 　　　　　　　　　　　　　　pp. 64, 65

The liability of the life tenant of a fund to make good to the remaindermen a loss resulting from improper investments by the former, is a "debt," to the payment of which, under Code, art. 16, sec. 233, the real estate of the life tenant can be applied. 　　　　　　　　　　　　　　pp. 65, 66

In an adjustment between primary and secondary liabilities, in payment of a debt, the secondary obligor stands substituted to the rights of the creditor against the primary or ultimate obligor. 　　　　　　　　　　　　　　**p. 66**

The right of an obligor, who is secondarily liable for a debt, to be substituted to the creditors' rights against the real estate of a decedent primarily liable for the debt, is not affected by the fact that the creditors are themselves the devisees of such real estate.     ·                                           p. 66

Even assuming that executors' liability for a loss, indirectly resulting from their payment of a fund to a life tenant thereof without any safeguards to protect the remaindermen, is a liability in tort, this does not affect the right of the executors to resort for reimbursement to the life tenant's estate, since, as between tort-feasors, one of whom is only secondarily liable for the injury, because of the other's wrong, the one so secondarily liable can demand an adjustment by such other.       pp. 66, 67

The payment of a fund by executors to the life tenant thereof, without any safeguards to protect the remaindermen, is not a voluntary payment under mistake of law, within the rule that such a payment is irrevocable.                             p. 67

Even if the payment of a fund by executors to a life tenant thereof, without any safeguards to protect the remaindermen, could be regarded as a voluntary payment under mistake of law, this would not affect the right of the executors, when charged with liability for a loss resulting from improper investments by the life tenant, to substitution or subrogation to the rights of the remaindermen against the life tenant's estate.         p. 67

When executors, who wrongfully paid over a fund to a life tenant thereof without safeguarding the remaindermen, and thereby incurred liability to the remaindermen, seek to be substituted to the rights of the latter against the assets of the life tenant's estate, as those of the party ultimately liable, they stand on the same footing as the remaindermen in resorting to those assets, and the period of limitations is the same for each.
                                                            p. 68

*Decided June 10th, 1926.*

Appeal from the Circuit Court for Charles County, In Equity (DIGGES, C. J.).

Bill by Annie Boothe Carroll and Joseph Bernard Boothe against Harry R. Bowling, John F. Mudd and others, fol-

lowed by a cross bill by the defendants named against the
plaintiffs. From a decree overruling a demurrer to the cross
bill, plaintiffs appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON,
URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*John Holt Richardson* and *Allan W. Rhynhart,* with whom
was *Ferdinand C. Cooksey* on the brief, for the appellants.

*John F. Mudd and Walter J. Mitchell,* for the appellees.

BOND, C. J., delivered the opinion of the Court.

The question presented on this appeal is whether execu-
tors, who, in distributing an estate, wrongly turned a fund
over to a life tenant without investing it so as to protect the
remaindermen, and who, consequently, are required to make
good to the remaindermen a loss sustained during the life
tenancy, may now, after the death of the life tenant, demand
reimbursement from other property owned by her absolutely,
and about to be distributed, to, or to vest in, her legatees and
devisees, including the remaindermen of the first fund. The
question comes up on pleadings only, being raised by de-
murrer to a cross-bill by the executors.

Charles Boothe and Julia Ann Boothe, his wife, colored,
of Charles County, each executed wills leaving property to
the other for life, with remainders to children of each. Chil-
dren of the wife by a former marriage were, under her will,
to share as remaindermen in her real estate. Charles Boothe
died first, on March 18th, 1919, and the appellees Harry R.
Bowling and John F. Mudd qualified as executors of his
will. The personal estate, which, after payment of all debts
and expenses of administration, amounted to $7,824.25, was
turned over by the executors to the widow, Julia Ann Boothe,
in United States government bonds registered in her name,
cash deposited in a savings bank in her name, and other cash
and personal chattels delivered over to her. Upon the death
of Julia Ann Boothe, in 1924, an inventory filed by Harry
R. Bowling, as her executor, of personal assets held by her,

including those received from her husband's estate, showed
a total valued estate of only $3,562.22, together with certain
securities returned without valuation. The loss appears to
have resulted from the investment by the life tenant in these
securities. Thereupon Annie Boothe Carroll and Joseph
Bernard Boothe, remaindermen under the will of the de-
ceased husband, Charles Boothe, filed a bill in the Circuit
Court for Charles County, in equity, praying that the loss of
assets thus shown be accounted for and made good by the
executors, and a demurrer by the executors to this bill was
overruled. In addition to the facts set out above, it was
averred in the bill that Charles Boothe and Julia Ann Boothe
were illiterate colored people, who acted upon the advice of
Harry R. Bowling, who was a real estate agent and farmer,
and of John F. Mudd, a lawyer, and that the latter, as execu-
tors, not only turned over the whole estate of the husband to
the widow without safe-guarding the interests of the remain-
dermen, but, although they had knowledge of the unfortu-
nate investments at the time they were made, Harry R. Bowl-
ing having assisted the widow to withdraw money from the
savings account to purchase the stock from his son, they
made no effort to avert the loss.

The demurrer to this original bill having been overruled,
the respondents answered, denying that they were account-
able for the amount lost, and averring that they had turned
the assets over to the widow in good faith, in an honest per-
formance of their duty, as they understood it from their con-
struction of the will, and their personal knowledge of the in-
tent of the husband when he executed it. And Harry R.
Bowling denied that he ever assisted Julia Ann Boothe to
withdraw any portion of the savings account to buy the stock,
and averred that, except for the first sale by his son of $2,000
of stock, he had no knowledge of any sale until after it had
been made.

The answer was followed by the filing of the cross-bill of
Bowling and Mudd against the remaindermen. To this a
demurrer was filed, and was overruled; and it is from the
overruling of this demurrer that the appeal is taken. The

cross-bill avers that Julia Ann Boothe, at the time of her death, owned separately and absolutely personal assets appraised at $894.15, and about to be distributed to the defendants, children of Charles and Julia Ann, and a farm which will pass under the devise of their mother to Julia Ann's children by both husbands. And it prays that if any liability should be found to rest upon the complainants for loss of assets of the estate of Charles Boothe while in the hands of the life tenant, Julia Ann, and they should be required to make good the loss, then they should be reimbursed from the separate assets of Julia Ann, devised and bequeathed by her to the defendants, and so be required to pay, on the whole, only so much as the net proceeds of all the personal and real estate of Julia Ann might fall short of making good the loss of assets received from her husband.

The sum and substance of the demand, then, is that the executors, if required to pay the legacy again now, out of their own money, to make good to the remaindermen a loss sustained while the funds were in the hands of the life tenant, shall have the assets of the life tenant first applied, on the ground that she was the one primarily responsible to the remaindermen for the loss. There is a question whether, on the allegations made, the executors here were not themselves primarily responsible, as for a waste of their own, whatever may have been the responsibility of the life tenant. It is urged that payment of the fund without restriction into the hands of one incapable of handling it, was such negligence, or an act attended with such danger, as should be held to render the executors primarily responsible for waste. But we think that situation is not established by the pleadings. While the allegations of the original bill refer to the ignorance and dependence of Julia Ann Boothe, and negligence in making payment to her, this is not admitted or proved. The answer and cross-bill show that Julia Ann had the estate of her first husband left in her hands, without restriction. And on the demurrer to the cross-bill, which we are now considering, we are not permitted to take it as established that there was negligence constituting waste in the mere placing of her

second husband's assets in her hands. It is urged again, that the executors themselves are to be regarded as guilty of actual waste, and are primarily responsible, because of their failure to avert the loss when the life tenant made the investments. There is nothing in the cross-bill itself concerning any connection of the executors with the investments, and on the original bill and answer it appears only that one executor failed to interfere to prevent one large investment, although he knew of it before it was made. But the facts thus admitted would not, in our opinion, be sufficient to make even that one executor a participant in the waste which now appears to have occurred at that time, and so primarily responsible for it. It is not admitted that he took any active part in having the investments made; he appears as having been passive merely, acting upon the erroneous assumption that the life tenant was free to handle the assets as she pleased, the assumption on which they were turned over to her unrestricted control in the first place. On the allegations in the pleadings, this wrongful distribution in the first place appears to have been the *devastavit* for which alone the executors would be responsible, and the responsibility would we think be secondary only.

In *Hanson v. Worthington,* 12 Md. 418, a bill was filed by remaindermen under a will against a surviving executor and against residuary legatees, to compel payment of a legacy which, by mistake, had been ignored in the distribution, so that the amount was wrongly distributed to the residuary legatees, and the executor in his answer demanded that, if the distribution made should be found so erroneous, and he should be held liable to pay the amount of the legacy to the remaindermen, then the residuary legatees, who received the money with which it should have been paid, and who were co-defendants, should be compelled by decree to refund and pay it to him, or, directly, to the complainants. And it was decreed that this should be done. The Court remarked that the executor was liable for the amount primarily, and the residuary legatees who had received the money were liable ultimately, and that as the latter were alive and in court,

subject to decree, the court should do simple justice by this
equitable adjustment in the decree of the claims of all par-
ties.  While the Court described the liabilities as primary
and ultimate in that case, it is evident that the distinction
drawn was the same as that generally drawn between second-
ary and primary liabilities, and that the executor's liability
was held to be that generally described as secondary.  And
there was in that case, therefore, an adjustment between pri-
mary and secondary liabilities, with the primary or ultimate
liability first applied to the payment of the common cred-
itor.  And, again, in *Prince de Bearn v. Winans,* 111 Md.
434, because of a mistake in construing a power of appoint-
ment in a will by the law of the domicil of the testator rather
than by the law of the domicil of the donee of the power,
the complainant, who should have received in distribution
the whole of a trust fund, received only one-third, the re-
maining two-thirds having been distributed to his children;
and on a bill brought by him against the trustees and the
children, it was decreed that the distribution should be cor-
rected by payment from the children who were co-defend-
ants.  And see *Zollickofer v. Seth,* 44 Md. 359, 373, 374.
And these decisions seem to us, and they did to the trial
court, to dispose of the main contentions of the appellants
on the demurrer here, notwithstanding some differences in
the facts which have been pointed out by counsel.

In the first place, the recipients of the wrongful payments
in the cases just cited were, as the court remarked, living
and in court, subject to decree, while here the life tenant is
dead and the cross-bill attempts to resort to assets received
by the defendants from her; and such a resort to the prop-
erty of a decedent is subject to restrictions.  With respect
to the real estate, the claimant can proceed only under the
provisions of the Code, art. 16, sec. 233, to have real estate
applied to the payment of the debts of the decedent, and it is
argued that there would be no such debt of the deceased here
to the plaintiffs in the cross-bill, as, under the statute, is

essential to this proceeding. But in an adjustment between
primary and secondary liabilities, in payment of a debt, the
adjustment which is sought by this cross-bill, the secondary
obligor stands substituted to the rights of the creditor against
the primary or ultimate obligor. *Sheldon on Subrogation,*
sec, 1; 6 *Pomeroy, Equity Jurisprudence,* sec. 921; *State v.
Graham,* 115 Md. 520, 523. And we think the liability of
the life tenant to make good the loss to the remaindermen,
which would rest upon her from the moment the loss oc-
curred, would be a debt within the meaning of the statute,
and for the payment of which the real estate of the decedent
might be resorted to. *Dickerson v. Baltimore,* 48 Md. 583,
589; *McLaughlin v. Long,* 5 H. & J. 113. The circum-
stance that, in this case, the real estate is devised to remain-
dermen who themselves constitute the creditors, cannot, in
our opinion, affect the operation· of the principle of substi-
tution and the right of the party secondarily liable, to have
the adjustment of liabilities in accordance with it. The
liability of the decedent and her assets is none the less alive
for this purpose.

That the error of the executors in distributing to the life
tenant without any reservations or safe-guards constituted a
*devastavit,* and resulted indirectly in a loss, is not, we think,
a fact which distinguishes this case from *Hanson v. Worth-
ington* and *Prince de Bearn v. Winans, supra,* and which
should prevent the reimbursement or substitution allowed in
those cases. If in *Hanson v. Worthington* the assets had been
wasted by the wrongful recipients, the case would have been
the same in that respect as the present case; and the Court
there made the adjustment of liabilities without reference
to the possibility of waste. Moreover, it has been held that
the liability for such a *devastavit* is contractual merely (*Wil-
liams, Executors,* 11th Ed., p. 1613), so that the executor is
not to be regarded as a tort-feasor. But if the liability should
be regarded as one in·tort, the wrong was not that which im-
mediately caused the loss. The immediate cause was, as has
been said, the ill-advised investment, and under the broad

principle of substitution or subrogation, the executors would, we think, be entitled in this case to resort for reimbursement to the liability of the person ultimately responsible, notwithstanding their own wrong. Such an adjustment is commonly allowed between tort-feasors who are both liable for an injury, but one of whom is made liable only because of a wrong of the other. *Ches. & O. Canal Co. v. Allegany Co.*, 57 Md. 201; *B. & O. R. R. Co. v. Howard County*, 111 Md. 176; *Franzell's Exrs. v. Franzell*, 153 Ky. 171.

The appellants argue, further, that the executors are seeking no more, after all, than repayment of an amount voluntarily paid by mistake of law, a right to which has been so often denied by this and other courts. *Baltimore v. Harvey*, 118 Md. 275; *Baker v. Baker*, 43 Md. 627; *Rogers v. Ingham*, 3 Ch. D. 35; *Shriver v. Garrison*, 30 W. Va. 456; *Phillips v. McConica*, 59 Ohio St. 1. But this is not a case of such payment by mistake as is commonly held irrevocable under this rule. Julia Ann Boothe was entitled to receive the assets paid over to her, and the executors are not demanding that the payment be revoked and the money repaid to them. Their mistake was in failing to adopt a prescribed method which would have assured the ultimate payment over by her to the remaindermen, and they are demanding that her assets be applied first to make good her loss and failure so to pay the assets over. Even if such a mistake in method could be properly described as one of law, within the meaning of the rule we are discussing, the objection would not, in our opinion, apply to prevent the operation of the principle of substitution or subrogation in the suit brought by the common creditors for a further payment. We do not see that such an objection has anything to do with the adjustment between the two liabilities for the loss. In *Hanson v. Worthington, supra*, the executors made the mistake of assuming that a refusal of a widow to take a life interest under her husband's will, preferring her thirds, destroyed the whole legacy, the remainder along with the life interest, a pure mistake of law, yet the adjustment of liabilities was allowed.

It is contended that the claim of the executors should be considered barred by laches or limitations. In respect to this, it is argued that the decisions in *Hanson v. Worthington,* and *Prince de Bearn v. Winans, supra,* are rested on facts which are not to be found in this case. But if it is true, as we think it is, that the executors who incurred their liability to the remaindermen by their wrongful payment to the life tenant are substituted to the rights of the remaindermen against the assets of the latter as those of the party ultimately liable, then the executors stand on exactly the same footing as the remaindermen in resorting to those assets, and the period of limitations is the same for each. *Ohio Life Ins. Co. v. Winn,* 4 Md. Ch. 253, 262; *American Bonding Co. v. Mechanics Bank,* 97 Md. 598, 607. The demand of the executors is, therefore, not open to attack because of laches or limitations.

*Decree affirmed, with costs to the appellees.*